IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re:<br>**James Alfred Davies,**<br>    Debtor. | §<br>§<br>§<br>§<br>§ | **Case No. 04-33436-H1-7**<br>**(Chapter 7)** |
| **Guarantee Company of North America**<br>**f/k/a Atlantic Fidelity and Surety Co.,**<br>    Plaintiff,<br><br>**v.**<br><br>**James Alfred Davies,**<br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 04-3541**<br><br>**Adversary No. 04-3896** |

## <u>MEMORANDUM OPINION</u>

James A. Davies filed a petition under chapter 7 on March 2, 2004. On July 15, 2004, Guarantee Company of North America ("Guarantee") filed a Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6). On November 11, 2004, Guarantee filed a Complaint to Bar Discharge Pursuant to 11 U.S.C. § 727(a)(3) and (a)(5). The Court held a trial on these matters on April 5, 2005 and May 9, 2005. This order is issued in both above-captioned adversary proceedings.

### Background

James Davies owned and operated Davies Rail and Mechanical Works, Inc. along with his wife, Angela Schnuerle, and his daughter. Mr. Davies formerly served as the vice president of Davies Rail. He is currently the president and sits on the board of directors. Davies Rail obtained four performance bonds from Guarantee: 1) a $1,105,000 performance bond for the benefit of Newpark Shipbuilding regarding the refurbishment and construction of two cranes; 2) a $97,307 performance bond and a $248,653 payment bond for the benefit of the Department of

the Navy regarding the installation and delivery of two cranes; 3) a $314,210 performance bond and a $157,105 payment bond for the benefit of the U.S. Army Corps of Engineers regarding a baffle block replacement, and 4) a $223,400 performance bond and a $117,000 payment bond for the benefit of the U.S. Army Corps of Engineers regarding replacement of tainter gates.

On or about April 20, 2001, Davies Rail, Mr. Davies, and Ms. Schnuerle requested that Guarantee take over and complete the four construction contracts because Davies Rail was incapable of completing the work. Guarantee took over the contracts and completed the work. Guarantee alleges that, as a result of it completing the work under the bonds, Davies Rail is liable to Guarantee for $788,730.30, plus attorneys' fees and interest (which totals $848,730.30).

Davies Rail owned three CDs held by Sterling Bank, formerly known as Lone Star Bank, and owed $750,000 on a line of credit. Around early 2000, Davies Rail redeemed one of the three CDs to be paid on the line of credit to reduce its obligation. As of December 31, 2000, Davies Rail anticipated that the existing contracts of Davies Rail were going to result in a $1,786,465 loss.

Portal Cranes of California ("Portal Cranes"), a sister company to Davies Rail, was formed during this period. Portal Cranes and Davies Rail had the same employees, contact information, and bank accounts. Occasionally the entities paid each other's expenses. Portal Cranes engaged in a project in Washington State in 2001. The proceeds were used to pay off Davies Rail's debt with Sterling Bank in late 2001. Sterling Bank then released its lien on the assets of Davies Rail. Around this same time, the Debtor personally withdrew the remaining CDs from Sterling Bank (each worth more than $101,000) and used the proceeds for personal expenses, such as gambling trips and clothing for girlfriends.

2

**Discussion**

The Court must consider whether Guarantee's claim is non-dischargeable under 11 U.S.C. § 523(a)(4) or (6), and whether Mr. Davies is entitled to a discharge under 11 U.S.C. § 727(a)(3) or (5).

11 U.S.C. § 523(a)(4) states that:

> A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt … for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4). Before a court can determine a debt to be non-dischargeable for fraud or defalcation under 11 U.S.C. § 523(a)(4), the court must find that the debtor was acting in a fiduciary capacity. *In re Wright,* 87 B.R. 1011 (Bankr. D. S.D. 1988). Federal law controls the determination of who is a fiduciary for purposes of 11 U.S.C. § 523(a)(4), although state law is relevant to the issue and can be consulted to determine when a trust obligation exists. *In re Gupta*, 394 F.3d 347, 350 (5th Cir. 2004) (quoting *In re Bennett*, 989 F.2d 779, 784 (5th Cir. 1993)). "The trust obligations necessary under section 523(a)(4) can arise pursuant to statute, common law or a formal trust agreement." *In re Bennett*, 989 F.2d 779, 785 (5th Cir. 1993). In general, courts narrowly construe the exception to discharge analyses against the creditor and in favor of the debtor. *See, e.g., In re Cross*, 666 F.2d 873, 879-880 (5th Cir. 1982).

Guarantee argues that discharge should be denied because the Debtor's use of the CDs for gambling and other recreation constituted fraud under § 523(a)(4). However, "[f]raud for the purposes of § 523(a)(4) has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud." 4 COLLIER ON BANKRUPTCY 523.10, (15th ed. 2004) (citing *In re Tripp*, 189 B.R. 29 (Bankr. N.D. N.Y. 1995); *In re McDaniel*, 181 B.R. 883 (Bankr. S.D. Tex. 1994)). Guarantee argues that the Debtor committed actual or constructive fraud by converting

the CDs and failing to preserve Davies Rail's assets for creditors.  Nonetheless, Guarantee has

failed to make any showing that the Debtor exercised intentional deceit when he engaged in

those acts. The Court finds that the Debtor lacked the intention to deceive when he converted the

CDs for personal use and failed to pay Guarantee.  Therefore, the debt is not exempted from

discharge under § 523(a)(4).

Guarantee further asserts that the Mr. Davies violated his fiduciary duties to creditors of

Davies Rail, which arose from the trust fund theory.  The trust fund theory is an exception to the

general rule that corporate officers and directors owe a fiduciary duty the corporation, not to the

creditors of the corporation.  *Fagan v. La Gloria Oil & Gas Co*., 494 S.W.2d 624, 628 (Tex. Civ.

App.—Houston [14th Dist.] 1973, no writ).  If a director or officer breaches his duty to the

corporation, the corporation usually has exclusive standing to bring a cause of action against the

officer. *Id*.  Therefore, a breach of the director or officer's fiduciary duty to the corporation

ordinarily does not create a cause of action for a creditor with respect to the injuries that the

corporation has suffered as a result of the breach.  *Id*.  However, the trust fund theory establishes

independent fiduciary obligations in the officers and directors of a corporation to the

corporation's creditors.  "The breach of that duty gives rise to a cause of action against the

officers and directors which can be prosecuted directly by the creditors."  *Id*.  Under the trust

fund theory, a trust is placed on corporate assets for the benefit of its creditors. The trust fund

theory states:

> When a corporation (1) becomes insolvent and (2) ceases doing business, then the
> assets of the corporation become a trust fund for the benefit, primarily, of its
> creditors. The officers and directors owe a fiduciary duty to the creditors. They
> must administer the corporate assets for the benefit of the creditors and to ratably
> distribute them. A breach of the duty gives rise to a cause of action against the
> officers and directors which can be prosecuted directly by the creditors.

*Id*.

In the present case, there is no dispute that Davies Rail was insolvent and had ceased doing business prior to the time Mr. Davies is accused of breaching his fiduciary duty.  After insolvency: (i) the Debtor took money from Davies Rail while the company was insolvent, and (ii) the Debtor was acting as a fiduciary as of April 20, 2001.  *See* TT p. 104, ln. 21-14. Since the Debtor was acting as a fiduciary under the trust fund theory, he had a duty to ratably distribute corporate assets for the benefit of creditors.

The duty established under the trust fund theory requires the directors of a corporation to distribute the assets without preferring one creditor over another. *Tigrett v. Pointer*, 580 S.W.2d 375, 383 (Tex. Civ. App. – Dallas 1978, writ dism'd).  Furthermore, the directors may not manipulate the affairs of the corporation by preferring themselves as creditors to the injury of general creditors. *Id*. (citing *Continental Supply Co. v. Forrest E. Gilmore Co.*, 55 S.W.2d 622, 628 (Tex. Civ. App. Amarillo 1932, writ dism'd).

While the Debtor here clearly preferred himself to creditors including Guarantee, it is nonetheless unclear whether the fiduciary duty owed by the Debtor to Guarantee under the trust fund theory fits within the exceptions to discharge under § 523(a)(4).  The Supreme Court found that the discharge exceptions only apply to fiduciary duties arising out of technical or express trusts, not those implied by contract. *Chapman v. Forsyth*, 43 U.S. 202, 207 (1844). The Supreme Court later clarified that the trust must exist prior to the act creating the debt and without reference to that act. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934); *Upshur v. Briscoe*, 138 U.S. 365, 378 (1890) ("The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created"). The Fifth Circuit has not directly dealt the application of the trust fund theory to § 523(a)(4), but bankruptcy courts in other circuits have addressed the issue.

The court in *In re Bruning* held that the § 523(a)(4) exceptions are applicable to a breach of fiduciary duty under the trust fund theory. *In re Bruning,* 143 B.R. 253 (Bankr. D. Colo. 1992). The court read *Davis* to mean that § 523(a)(4) fiduciary capacity includes both express trusts and technical trusts (trusts which arise by law before any wrongdoing, but not involving a declaration of trust or the intent to create a trust relationship). *Id*. at 256. The *Bruning* court further stated that the critical analysis is whether, chronologically, the fiduciary obligation arose *before* the wrongdoing or *as a result of* the wrongdoing. *Id.* According to the court, under the trust fund theory, the fiduciary obligation arises upon insolvency—not in response to later wrongdoing—and "thus falls squarely within 11 U.S.C. § 523(a)(4)'s ambit." *Id.*

Several bankruptcy courts have adopted the *Bruning* chronological analysis. *See, e.g., In re Kallmeyer*, 242 B.R. 492, 496 (9th Cir. BAP 1999); *In re Reuscher*, 169 B.R. 398, 403 (Bankr. S.D. Ill. 1994); *In re Caretta,* 219 B.R. 66, 73-74 (Bankr. D. N.J. 1998); *In re Schultz*, 208 B.R. 723, 728-29 (Bankr. M.D. Fla. 1997). Other courts have declined to follow *Bruning* and found that the § 523(a)(4) exceptions apply only to express trust obligations—thereby excluding the trust fund theory. *See, e.g.*, *In re Kaplan*, 162 B.R. 684, 706 (Bankr. E.D. Pa. 1993); *In re Martin*, 154 B.R. 490, 492 (Bankr. C.D. Ill. 1993).

The Fifth Circuit has not directly addressed a case concerning the trust fund theory with respect to § 523(a)(4) discharge exceptions, but it used reasoning similar to the *Bruning* test in *In re Angelle*, 610 F.2d 1335 (5th Cir. 1980)—a case decided under the Bankruptcy Act. *Angelle* dealt with a Louisiana law criminalizing a contractor's use of funds advanced by a contracting party for any purpose other than material or labor for the party's project. *Id*. at 1337. Five parties who had advanced funds to Angelle, a contractor who declared bankruptcy while building homes

for the parties, filed objections to discharge of their claims against Angelle under § 17(a)(4).[1] *Id.* at 1336.  Angelle admitted putting all of the money received from the parties into one bank account and using the funds to pay off general business debts.  *Id.* at 1337.  The parties claimed that, under the statute, Angelle was acting in a fiduciary capacity the moment the funds were advanced to him.  *Id*.

The Fifth Circuit held that, although Angelle may have misappropriated funds, he was not acting in a fiduciary capacity prior to the misappropriation.  *Id*. at 1336.  Angelle became a trustee only at the time of, and because of, the misappropriation—thus violating the *Davis* requirement that the trust must exist prior to the debt and without reference to it.  *Id*.  This reasoning is analogous to the *Bruning* test.  Under *Bruning*, an exception to discharge is satisfied under § 523(a)(4) if the fiduciary obligation arose before the wrongdoing.  Thus, the application of the *Bruning* test to the facts in the present case would appear to comply with the Fifth Circuit's analysis in *Angelle*.

This Court finds that the § 523(a)(4) exceptions to discharge are applicable to fiduciary duties created by the trust fund theory—thus, the exceptions are applicable to the Debtor's duty in this case.  First, the Fifth Circuit in *Angelle* recognized that the discharge exceptions include fiduciary obligations arising from technical trusts.  The fiduciary duty created by the trust at issue in the present case meets the definition of a technical trust used by the *Bruning* court.  The trust arose by law when (1) Davies Rail became insolvent and (2) ceased operations.  Further, the trust was established prior to any wrongdoing by Mr. Davies.  Second, the chronological test of *Bruning* is met because the fiduciary obligations arose when the company became insolvent— not as a result of any wrongdoing by Mr. Davies. Therefore, the Court finds that the trust fund

---

[1] Section 17(a)(4) is the prior version of § 523(a)(4).  The language is identical in its use of fiduciary.

theory is applicable to the § 523(a)(4) discharge exceptions through the application of the *Bruning* test to the facts in the present case.

The Court next considers whether defalcation of the Debtor's fiduciary duties occurred. "Defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement." *Moreno v. Ashworth*, 892 F.2d 417, 421 (5th Cir. 1990). A finding of defalcation turns on whether the debtor's breaches were "willful." *In re Felt*, 255 F.3d 220, 226 (5th Cir. 2001). The Fifth Circuit has stated that the "willful neglect" of a fiduciary duty is "essentially a recklessness standard." *Id*. Willfulness is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known. *Roy v. Gravel*, 143 B.R. 825, 828 (W.D. La. 1992). The Supreme Court defined "willful neglect" as "a conscious, intentional failure or reckless indifference." *United States v. Boyle*, 469 U.S. 241, 245 (1985). This standard charges the debtor with knowledge of the law without regard to analysis of his actual intent or motive. *Id*.

Here, the Debtor failed to fulfill his fiduciary duty to ratably distribute the assets without preferring one creditor over another. He preferred himself as a creditor to the injury of Guarantee, a general creditor of the company. The Debtor received payment for a government job in October of 2001. *See* TT p. 26, ln. 19-21. He used the money to payoff Davies Rail's line of credit at Sterling Bank. *See* TT p. 26, ln. 22-24. These events resulted in the release of two CDs owned by Davies Rail. *See* TT p. 26, ln. 25-p.27, ln. 2. Mr. Davies personally took the two CDs to finance numerous gambling trips. *See* TT p. 27, ln. 5-10. Further, the Debtor failed to use any of the proceeds from the liquidation of Davies Rail's assets to pay off any of the debts owed to Guarantee. *See* TT p. 27, ln. 24-p.28, ln. 6. Nonetheless, during this period, a number of Davies Rail's other creditors did receive payment. *See* Exhibit 35.

Thus, the Debtor violated his fiduciary duty to ratably distribute Davies Rail's assets to its creditors by preferring himself and other creditors over Guarantee.  The evidence before the Court indicates that Mr. Davies preferred himself to Guarantee's injury.  The Court finds that this behavior constitutes defalcation of the Debtor's fiduciary duties to Guarantee because the Debtor acted with a reckless indifference to the duties he owed to Guarantee.

The Court next considers the effect on the Debtor's discharge under § 523(a)(6).   11 U.S.C. § 523(a)(6) states:

> A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt…for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6). The United States Supreme Court concluded that § 523(a)(6) only applies to acts done with the actual intent to cause injury, not intentional acts that cause injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *see also Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998); *In re Delaney*, 97 F.3d 800, 802 (5th Cir. 1996). The Fifth Circuit has stated:

> The test for willful and malicious injury under § 523(a)(6), thus, is condensed into a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the debtor.

*In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003). The Fifth Circuit further stated that, "a debt is not excepted from discharge if the debtor has committed a willful or knowing act. The dischargeability … depends upon the intentional or certain nature of the injury." *Id*.

The Debtor's failure to make payments owed under contract to Guarantee is conduct that may prevent discharge under § 523(a)(6). Subsequent to *Walker*, the Fifth Circuit suggested that "a knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under § 523(a)(6), regardless of the existence of separate tortious conduct." *Id*. at 510. In addition to committing a knowing breach of clear contractual obligations, the Debtor arguably committed the intentional tort of conversion. Texas law defines conversion as the "unauthorized

9

and unlawful exercise of dominion and control over property inconsistent with or to the exclusion of another's superior rights in that property." *Vickery v. Texas Carpet Co.*, 792 S.W.2d 759, 762 (Tex. App.--Houston [14th Dist.] 1990, writ denied). The Debtor committed conversion when he took CDs belonging to Davies Rail (and its creditors, under the trust fund theory) and spent the money on personal pleasures, such as personal vacations, gambling, and clothing. *See* TT, pg. 102, ln. 7-10. The analysis of whether an exception exists turns upon whether there is explicit evidence that the Debtor (a) intended to cause injury to Guarantee or (b) was substantially certain that his actions would cause injury to Guarantee.

The debtor in *Williams* worked as an independent electrical contractor. *Id*. at 506. He entered into a collective bargaining agreement ("CBA") with the International Brotherhood of Electrical Workers Local 520 ("the Union"). Williams entered into the CBA in order to resolve problems he had with union workers on a project. *Id*. at 507. Under the terms of the CBA, Williams promised to only hire union workers for the project. *Id*. After encountering additional problems with the union workers, Williams hired non-union workers in order to complete the project. *Id*. The Union brought a cause of action against Williams in the United States District Court for the Western District of Texas for violating the CBA. *Id*. The court ordered Williams to pay $155,855.39 to the Union as restitution for his breach of the CBA. *Id.* Williams subsequently filed for bankruptcy. *Id*. The Union filed a complaint seeking to have the judgment excepted under § 523(a)(6). *Id*. at 508.

The Fifth Circuit found that, although Williams acted intentionally, he did not intend to injure the Union. *Id*. at 510. However, a more difficult decision for the court was deciding if Williams's knowing breach of the CBA was substantially certain to injure the Union. *Id*. The only direct injuries plead by the Union were injuries to its prestige and its ability to enforce its

contracts. *Id*. at 511. The court held that the debt could not be excepted under § 523(a)(6) because there was no evidentiary showing that Williams was substantially certain that his actions would injure the Union's prestige or its ability to enforce its contracts. *Id*. Williams did know that Union electricians would be deprived of employment opportunities if he hired non-union workers. However, these injuries were suffered by the workers themselves and not the Union.

In the present case, Mr. Davies seemed entirely aware of the contractual obligations Davies Rail had to pay Guarantee for the four jobs Guarantee completed for Davies Rail. *See* TT, pg. 16, ln. 20-23. The Debtor acted intentionally when he failed to make payments to Guarantee—while paying off other creditors and converting corporate assets for personal use. However, there is conflicting evidence over whether the Debtor intended to injure Guarantee through his actions. Mr. Davies testified that he was angry with Guarantee because of a perceived lack of communication on the part of the company. *See* TT, pg. 98, ln. 17-20. However, the Debtor also testified that when he took the CDs owned by Davies Rail for personal use, his only motivation was to prevent his ex-wife—also his former business partner—from obtaining the assets. *See* TT, pg. 102, ln. 15-17. The Debtor acknowledges that he mishandled funds, but claims that his actions were spontaneous and not with the intent to harm Guarantee. *See* TT, pg.98, ln. 7-8.

The Court finds Mr. Davies' testimony on this issue entirely credible. The Court therefore finds that Mr. Davies did not act with the intent to harm Guarantee when he converted assets of Davies Rail for personal use. Nonetheless, there was objective substantial certainty in the conversion of the assets that the Debtor's breach would harm Guarantee. Guarantee's injuries in the present case were a direct result of the Debtor's failure to make payments to Guarantee out of Davies Rail's assets. It is implausible that a sophisticated businessman, such as

Mr. Davies, was not substantially certain that his failure to make payments to Guarantee (for the $788,730.30 owed by Davies Rail) would result in the direct injuries suffered by Guarantee.

The Court finds that the Debtor was substantially certain that his actions in converting Davies Rails' assets for personal use would cause Guarantee the injury at issue. Therefore, the debt owed to Guarantee should be excepted from Mr. Davies' discharge under § 523(a)(6).

Guarantee further moves to deny the Debtor's entire discharge pursuant to § 727(a). Section 727(a)(3) states that a court shall grant the debtor a discharge unless:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all circumstances of the case.

11 U.S.C. § 727(a)(3). A bankruptcy judge has broad discretion to grant or deny a discharge based on a determination whether the records kept were adequate under the facts of the case. *McBee v. Sliman*, 512 F.2d 504, 506 (5th Cir. 1975) (citing *Goff v. Russell Company*, 495 F.2d 199, 202 (5th Cir. 1974)). The Fifth Circuit, in *McBee*, affirmed the bankruptcy court's denial of discharge, reasoning that, although gambling records are difficult to obtain, the debtor must produce some kind of direct evidence to explain the loss of assets in order to defeat an objection to his petition. *Id.* McBee only had airline ticket stubs and hotel receipts to account for an alleged $14,000 gambling loss. *Id.* He was unable to recount specific bets and only supplied a vague explanation of the manner of the losses. *Id.* This evidence was considered to be insufficient, and the debtor's discharge consequently denied in full under § 727(a). *Id.*

In the present case, resolving Guarantee's § 727(a)(3) claim turns on whether the Court finds that the Debtor's records, or lack of records, can be considered justified under the circumstances of the case. At the hearing, Mr. Davies provided testimony concerning his

gambling losses and a chart specifying amounts lost and won at specific casinos in 2002.  *See* Exhibit 25.  The Debtor also produced numerous receipts of cash advances from casinos and ATMs within casinos.  *See* Exhibit 26.  Unlike in *McBee*, the Debtor in the present case produced specific, direct evidence of his gambling activities and losses—not merely a vague explanation of surrounding events.  The Court finds that the Debtor has produced direct, specific evidence of his gambling activities sufficient to defeat Guarantee's objections to his discharge under the circumstances.  Denial of the Debtor's discharge pursuant to § 727(a)(3) is denied.

Further, § 727(a)(5) states that the court shall grant the debtor a discharge unless: "the debtor has failed to explain satisfactorily, before the determination of denial of discharge, any loss of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  One court has stated that:

> The problem of 'undocumented' theft and gambling losses claimed by a bankrupt debtor is especially troublesome to creditors and to bankruptcy courts because of the ease with which any debtor can make such claims to explain away a substantial discrepancy in his assets at the time of the bankruptcy filing.

*In re Mitchell*, 74 B.R. 457, 462 (Bankr. D. N.H. 1987).  Overall, there is a split among the courts in interpreting this particular provision.  Some courts deny discharge pursuant to § 727(a)(5) if the debtor fails to produce documentation corroborating his testimony concerning the losses.  *See*, *e.g.*, *In re Dolin*, 799 F.2d 252, 253 (6th Cir. 1986).  Other courts have held that no additional documentation is necessary if a court finds the debtor's testimony to be credible.  *See*, *In re Gallini*, 96 B.R. 491 (Bankr. M.D. Pa. 1989); *Mitchell*, 74 B.R. at 461.

The Fifth Circuit addressed this issue in *In re Reed*, 700 F.2d 986 (5th Cir. 1983).  There, the debtor could only account for the disappearance of $19,586 by explaining that he lost an unspecified amount in Las Vegas.  *Id*. at 993.  The court focused its analysis on whether the debtor "satisfactorily" explained his losses to the court:

13

> The word 'satisfactorily' . . . may mean reasonable, or it may mean that the court,
> after having heard the excuse, has that mental attitude which finds contentment in
> saying that he believes – he believes what the bankrupts say with reference to the
> disappearance or shortage.  He is satisfied.

*Id*. (quoting *In re Shapiro & Ornish*, 37 F.2d 403 (N.D. Tex. 1929)).  The court upheld the

bankruptcy judge's finding that the debtor's testimony did not constitute a satisfactory

explanation.  *Id*.

In the case before this Court, the Debtor has satisfied both tests.  The Court declines to

decide whether documentation is always necessary under § 727(a)(5).  Nonetheless, here, Mr.

Davies produced documentation corroborating his testimony concerning the gambling losses.

Further, the Court finds the Debtor's testimony concerning the losses to be credible and

satisfactory.  The Debtor was extremely candid regarding his gambling and business activities.

He openly admitted and freely discussed his involvement in these activities. He brought up his

actions without prodding by the trustee or the Court.  Regarding his activities, the Debtor

testified:

> But I'm surely no fool and if this $100,000 gifts to this girlfriend, I never
> admitted to that. This is in my deposition that it was somewhere under 10.
> Somehow another zero got put on it, but anyhow I'm not going to say I might not
> have given her $100,000, I'm just saying I didn't

> But back to intent, well, after I had liquidated everything and I thought, "What am
> I going to do?" I had to do something. I truly did. You know, I did something real
> simple. I went and built a chicken pen and bought 50 chickens.

> I hate to take up Court time for something that sounds so superfluous, but it gave
> me a reason to get up in the morning. I had 50 little critters, along with my two or
> three cows that I had to go out and water and feed. But that kept me from sleeping
> But that kept me from sleeping all day.

> Then one thing led to another, and I have gambled since I was 25, I guess. As a
> matter of fact the year I was 27, I paid taxes on probably 50 or $60,000 of
> gambling. My first personal income, I had when I was 27 years old. It was slightly
> under $100,000 personal. I paid taxes on it. That was 1965, your Honor. I'm no
> stranger to money.

So what did I do? Well, they had me crazy with Lucron (phonetic) and Calcidex (phonetic) and my hair was hair was falling out, and I didn't know whether to work because I couldn't make the Plaintiff listen to me. Two or three business, personal friends and acquaintances, and even shipyards and other people, I said, "Look. Let's get something going. Let me do this, while you do that."

"No, James. You've still got all these problems."

So maybe I did resort to the casinos. I did. I had a heck of a time. I don't know if that helped me live to now or not because it sure kept me busy and I have the diary part, which Mr. Durrschmidt has, so did Ron Summer, so did – well, I'm not sure who else, but anyhow I have the originals. I found them in the bottom of Mr. Williams' box. I thought they were lost, but he never – I don't know what he did.

But yes, in fact, I did gamble. I won. I lost. I paid credit card people. I mean, I have cross-referenced days when I admitted I won on my diary and then where I sat down and wrote MMBTA, $20,000, and maybe kept the one, $6,000.

So I mean the – and for a while, you know, I really wasn't down that badly. And I got lost in the melee of doubt, frankly. It just – it overtook me. I don't feel good about that. I would defend having probably blown $150 or $200,000, but I went beyond that, I'm aware. I went $300 to $350,000, and anyhow the records are here [referring to Exhibits 25 and 26]. Mr. Durrschmidt has categorically gone through and has in his exhibit bits and pieces of just what helps his position.

*See* TT, p. 14, ln. 1-p. 15, ln. 22.

Maybe today I could have settled with them, but I did blow most of the money. I testified last time that I had in the – the approximate value of the two CD's well through the year '02 and that's a true statement. Actually, in February of '03, I still had a couple of hundred thousand dollars. Now as – I must add that I had no idea what their claim would be – the Plaintiff's claim would be. They had collected for the work from the owners about $900,000. I have never seen any accounting. To be honest with you, your Honor, I don't know how they spent another 7, 8. All of the jobs were profitable with the exception of the problem in Galveston, and all they had to do with Galveston was to do the performance. I paid the bills. They did the performance.

The other jobs had payment and performance bonds, which in fact, they did get the bills that I had incurred. Those were not bills I felt obligated to pay.

*See* TT, p. 16, ln. 18-p. 17, ln. 8.

I expected these people to perform. They wrote the bonds. I paid them. They took the chances. Every step of the way I talked to them. They were in the midst of a

> merger. I did find out something about the plaintiff, which is not in my opinion
> relative and maybe I shouldn't discuss it because it's kind of gossip, but they're
> percentage clippers. They write paper. They clip a couple of points, and they
> discount them. They were right in the middle of a merger with someone. They
> didn't need my claim. I don't know why they wouldn't talk to me, but maybe
> somewhere in this – that confusion, your Honor, helped exacerbate my situation.

*See* TT, p. 18, ln. 8-18.

The Court was impressed with the candor of the Debtor and the forthright nature of his testimony. The Court also found the Debtor to be a credible witness. This was the Court's initial reaction upon hearing Mr. Davies' testimony at the hearing,[2] and no further evaluation of the facts changes the Court's conclusion. Therefore, movant's request pursuant to § 727(a)(5) is denied.

For the reasons stated above, the Debtor's discharge is not denied under § 727(a)(3) or (5). Nonetheless, Guarantee has met its burden under § 523(a)(4) and (6). Pursuant to § 523(a)(4), any debts from the Debtor's defalcation of his fiduciary duties are excepted from discharge. The trust fund theory allows Guarantee, as a creditor, to hold the Mr. Davies, as a director, liable for "that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors." *Tigrett*, 580 S.W.2d at 384. The Court further finds an exception to discharge under § 523(a)(6) because the Debtor was substantially certain that his actions would cause Guarantee the injuries at issue.

The entire amount owed by the Debtor to Guarantee is $788,730.30. Guarantee's brief states that, at the time of defalcation, Davies Rail's assets totaled in excess of $975,000. The Debtor has not submitted any evidence disputing the assets held by Davies Rail or claiming that a pro rata distribution of assets would result in less than full payment on Guarantee's claim. The Court finds sees no reason to dispute Guarantee's claim to the full amount. Guarantee's

---

[2] *See* TT, p. 107, ln. 6-8.

recoverable pro rata share is $788,730.30, the full amount of the debt owed to them by Davies

Rail.  A separate judgment is entered contemporaneously with this opinion.

      Signed at Houston, Texas on August 17, 2005.

MARVIN ISGUR
United States Bankruptcy Judge